UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLENE M. HAMILTON,

       Plaintiff                                  Civil Action No. 09-11553

v.                                         HON.  JOHN CORBETT O'MEARA
                                         U.S. District Judge
                                         HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL           U.S. Magistrate Judge
SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Charlene M. Hamilton brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for disability insurance benefits ("DIB") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).   I recommend that   Defendant's Motion for Summary Judgment be DENIED and  that Plaintiff's Motion for Summary Judgment be GRANTED, remanding this case for an award of benefits.

## PROCEDURAL HISTORY

On May 23, 2002,  Plaintiff filed an application for benefits, alleging an onset date of August 10, 2001 (Tr. 38-40).   After the initial denial of her claim, Plaintiff filed a  request

for an administrative hearing, held on June 18, 2004 in Detroit, Michigan before Administrative Law Judge (ALJ) Kathryn D. Burgchardt (Tr. 28, 287). Plaintiff, represented by attorney Dannelly C. Smith, testified, as did Vocational Expert ("VE") Jennifer Turecki (Tr. 291-318, 318-324). On July 13, 2004, ALJ Burgchardt found Plaintiff not disabled (Tr. 20). On January 8, 2005, the Appeals Council denied review (Tr. 5-7). Plaintiff filed for judicial review in this Court on March 28, 2005. *Case No. 05-70886.* On September 14, 2005, parties stipulated to a remand for further administrative proceedings (Tr. 363-366).

Consistent with the stipulation, on February 22, 2006, the Appeals Council ordered an additional hearing, directing the ALJ to obtain updated medical records, "address all medical opinions of record," and take additional VE testimony (Tr. 372). On June 12, 2006, ALJ Burgchardt held a second hearing. Plaintiff, again represented by attorney Smith, testified, as did VE Samuel Goldstein (Tr. 534-538, 538-542). On August 24, 2006, ALJ Burgchardt again found Plaintiff not disabled (Tr. 361). On January 31, 2007, the Appeals Council denied review (Tr. 336-338). Plaintiff filed for judicial review of the final decision on March 24, 2009.

## BACKGROUND FACTS

Plaintiff, born May 27, 1961, was age 45 when the ALJ issued her last decision (Tr. 18, 50). She completed four years of college, working previously as a teacher, waitress, direct care worker in a group home, and a bilingual company representative at educational conferences (Tr. 91). Her application for DIB alleges disability as a result of severe headaches, pain and swelling of the right ankle, and concentrational problems (Tr. 45).

## A. Plaintiff's Testimony

### 1. June 18, 2004 Hearing

Plaintiff, then 43, testified that she graduated from college, earning an education degree (Tr. 292). She alleged that she had not been able to perform substantial gainful employment since August, 2001 (Tr. 294). Plaintiff reported that since August, 2001, her work activity had been limited to sporadic Spanish language tutoring and housecleaning (Tr. 295).

Plaintiff testified that she was currently under a psychiatrist's care for depression and anxiety (Tr. 297). She added that she spent five years in a federal prison as a result of a "conspiracy charge," noting that her criminal record made it impossible for her to obtain a teaching position (Tr. 297). Speaking from a medical standpoint, Plaintiff opined that her "emotional state," vision problems, and right foot swelling prevented her from working (Tr. 297-298). She reported that the foot swelling, occurring as a result of right ankle reconstructive surgery, prevented her from standing for extended periods or sitting for more than 30 minutes (Tr. 298). Plaintiff indicated that she relieved the ankle swelling by elevation and applying ice (Tr. 299).

Plaintiff alleged that as a result of optic nerve damage, she was unable to see well enough to obtain a driver's license (Tr. 300). She reported that her right ankle condition created pain approximately 75 percent of the time (Tr. 301). She indicated that she spent her day watching television and reading, adding that she enjoyed swimming (Tr. 301-302). Plaintiff, a regular AA meeting attendee, denied current drug or alcohol use, admitting that

prior to undergoing counseling, she experienced alcohol abuse (Tr. 302-303). Plaintiff, noting that she relied on public transportation, reported regular contact with friends and family members (Tr. 304). Plaintiff indicated that she continued to receive treatment for the ankle condition and psychiatric counseling (Tr. 305). She testified that she currently took Prozac, Klonopin, and Vicodin, along with Darvocet on an "as needed" basis (Tr. 308).

Plaintiff reported that between 1983 and 1993, she taught full-time, testifying that she was incarcerated on a drug charge in 1993 (Tr. 308). She opined that from a mental perspective, she would be able to return to her work as a science and gym teacher but that visual and foot problems prevented the performance of those jobs (Tr. 309). Plaintiff testified that she currently lived with her husband in a townhouse in Lincoln Park, Michigan (Tr. 309-310). She reported getting up at 5:00 every morning, admitting that she was able to care for her personal needs and perform occasional household chores such as washing dishes, dusting, and vacuuming (Tr. 310). Plaintiff reported that since the onset of disability, she had worked sporadically as a language teacher, interpreter, and housekeeper but at no point earned more than $100 dollars a month (Tr. 313-316). She indicated that although she experienced vision problems, she was able to read without significant difficulty (Tr. 318).

**2. June 12, 2006**

Plaintiff admitted that her June 18, 2004 testimony denying of all alcohol and drug use since entering counseling was untrue, stating that she "ashamed" to admit that she had

relapsed on several occasions (Tr. 535).

**B.    Medical Evidence[1]**

**1.    Treating Sources**

In May, 2001, Jonathan P. State, M.D. noted that Plaintiff was being treated with Rebitron for Hepatitis C (Tr. 121).  June, 2001 treating notes show that Plaintiff was issued a return to work note for July 2, 2001 (Tr. 122).  In August, 2001, Plaintiff sought emergency treatment after passing out at work as a result of heat exhaustion (Tr. 126).  CT scans of the head, ordered in response to Plaintiff's complaint of headaches and dizziness, were normal (Tr. 119-120).  Plaintiff was given Tylenol 3 and discharged in stable condition (Tr. 127).

In October, 2001, Plaintiff sustained a displaced bimalleolar fracture after falling (Tr. 140).  The same month, Plaintiff underwent an "open reduction and internal fixation" at the recommendation of surgeon Kevin J. Sprague, M.D. (Tr. 140, 147).  In response to a post-surgical infection, Plaintiff underwent an irrigation and debridement the following month (Tr. 150).  In December, 2001, Dr Sprague prescribed physical therapy (Tr. 136).  In January, 2002, Dr. Sprague removed portions of the hardware placed during the October, 2001 surgery in response to an ongoing post-surgical infection (Tr. 134, 153).  The following month, the infection had subsided (Tr. 132).  However, in May, 2002, x-rays revealed "early secondary osteoarthritic changes of the ankle" (Tr. 131).  Dr. Sprague, noting tendon abnormalities, recommended a custom ankle orthosis (Tr. 131).  Dr. John Z. Chrabuszcz,

---

[1]Plaintiff's treating record post-dating the December 31, 2003 expiration of benefits are included for background purposes only.

M.D. diagnosed Plaintiff with a posterior tibial tendon dysfunction (Tr. 130).

A psychiatric evaluation performed sometime between May, 2003 and May, 2004 noted that Plaintiff experienced depression and anxiety with a history of alcohol and drug abuse, assigning her a GAF of 45[2] (Tr. 274-275).  In July, 2002, Diane Olson, M.S.W., recommended anti-anxiety medication for Plaintiff (Tr. 269).  Later the same month, Olson observed "traits of obsessiveness and compulsiveness (Tr. 268).  Plaintiff admitted that she had drunk on occasions since her 1999 release from prison (Tr. 267).  Olson noted that Plaintiff had "a great deal of anxiety about riding with another driver" (Tr. 265).  In September, 2002, Plaintiff acknowledged both drug and alcohol use since being paroled (Tr. 263).  The same month, Olson commented on Plaintiff's relationship with her husband, noting that she exhibited "battered woman syndrome" (Tr. 261).  In October, 2002, Olson noted that Plaintiff had experienced only one crying spell since taking Prozak (Tr. 259).  However, later the same month, Plaintiff exhibited symptoms of anxiety (Tr. 258).

In January, 2003, Plaintiff admitted to smoking marijuana the previous month (Tr. 257).  Plaintiff, reporting headaches, requested a switch from Wellbutrin back to Prozak (Tr. 256).  Olson observed "signs that [Plaintiff] continues to use alcohol or drugs" (Tr. 256).  Plaintiff agreed to attendance in a four-week intensive outpatient program ("IOP") (Tr. 255).  The following month, Plaintiff reported sobriety with "[m]ood and thoughts in the normal

---

[2]
A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* ) (4th ed.2000).

range" (Tr. 237-245, 250). In April, 2003, Plaintiff admitted to renewed alcohol use, but later the same month appeared calm and cooperative at a therapy session (Tr. 233). In May, 2003, Plaintiff expressed an interest in teaching Spanish but admitted that she experienced "tremendous anxiety" when riding in a car (Tr. 225). Plaintiff reported that she had vomited after completing an hour long car trip the previous week (Tr. 255). June, 2003 treating notes indicate that she was alert and cooperative (Tr. 222).

In July, 2003, Plaintiff reported that she took Atavan only when riding in a car (Tr. 213). The same month, Michael Baghdoian, M.D., reviewing Plaintiff's history of ankle surgery, found that she had limitations in dorsi and plantar flexion (Tr. 406). An MRI performed the following month confirmed the presence of arthritis (Tr. 404).

Also in August, 2003, Olson noted that Plaintiff had made "significant progress" in her year of therapy (Tr. 209). The following month, Plaintiff was advised that for two dollars, a "Smart Connector" would pick her up at her house (Tr. 207). Also in September, 2003, Dr. Baghdoian noted that Plaintiff presented with a "puffy, swollen, and tender right ankle" (Tr. 402). In October, 2003, Plaintiff's husband confronted her "for not being able to work" (Tr. 206). Olson noted that Plaintiff had "been doing well in terms of sobriety, but . . . ha[d] much to overcome," including the inability to work (Tr. 205). The same month, Dr. Baghdoian, noting Plaintiff's complaints of cartilage loss and pain, recommended arthroscopic surgery (Tr. 399). In November, 2003, Plaintiff experienced an anxiety attack upon witnessing a car accident (Tr. 203). The same month, the arthroscopic surgery was performed without complications (Tr. 397). Dr. Baghdoian prescribed physical therapy (Tr.

396).

In February, 2004, Olson noted that Plaintiff had "picked up some odd jobs," but still needed anti-anxiety medication when riding in a car (Tr. 200). The same month, Olson assigned Plaintiff a GAF of 50 (Tr. 199). Dr. Baghdoian recommended steroid injections in response to Plaintiff's ongoing complaints of ankle pain (Tr. 394). His notes from the following month indicate that Plaintiff was working full-time (Tr. 392). In May, 2004, Dr. Baghdoian projected a return to work day of June 14, 2004, noting that Plaintiff was in the cleaning business on a part-time basis (Tr. 389).

Also in May, 2004, Dr. Sprague completed a "Lower Extremities Questionnaire" opining that Plaintiff's right ankle condition would distract her from job duties between one third and two thirds of her workday (Tr. 276). Dr. Sprague also opined that Plaintiff's work activities would be limited by the need to elevate her right leg to "waist level or above" two or more hours out of an eight-hour day (Tr. 277). The following month, Dr. Baghdoian completed the same questionnaire, mirroring Dr. Sprague's assessment (Tr. 386-387).

An "Affective Disorders Assessment" performed in June, 2004 found that Plaintiff experienced a depressive disorder accompanied by manic features (Tr. 278). Kanchana Madhavan, M.D. found *marked* limitations in Plaintiff's activities of daily living, moderate limitations in social functioning, and *marked* difficulties in maintaining concentration, persistence, or pace (Tr. 279). The Assessment noted that Plaintiff had experienced three extended episodes of decompensation including times at which 1) a car she was riding in hit a deer 2) her parole officer was suspicious of her behavior 3) her husband had a substance

abuse relapse (Tr. 279). Dr. Madhavan found Plaintiff unable to function outside "a highly supportive living situation," noting further that her symptoms would interfere with her ability "to maintain reliable attendance in a work setting" (Tr. 280). He found further that Plaintiff's work abilities would be hampered by the inability to deal with normal workplace stressors or maintain concentration (Tr. 281). Plaintiff's ability to carry out even simple job instructions was deemed fair, but her potential for behaving "in an emotionally stable manner" was deemed poor or non-existent (Tr. 282). Dr. Madhavan noted that Plaintiff's emotional limitations were exacerbated by ankle problems (Tr. 282). The following month, Scott Friedman, treating Plaintiff for acne resulting from a psychotropic medication, noted that her behavior was consistent with a diagnosis of an anxiety disorder (Tr. 439).

In September, 2004, Diane Olson submitted an opinion letter in response to the ALJ's July 13, 2004 non-disability finding, stating that the ALJ took Plaintiff's psychological treating notes "out of context" (Tr. 286). Olson stated that "progress notes reflect a sustained anxiety disturbance that has not responded well to therapy and treatment on a sustained basis" (Tr. 286). The same month, Wayne T. Cornblath, M.D. found that Plaintiff's bilateral optic neuropathy had stabilized, noting that her corrected vision was 20/60 (Tr. 441).

In July, 2005 Plaintiff experienced gastrointestinal bleeding (Tr. 427-429). In August, 2005, Plaintiff was treated for dermatitis and advised to stay off her feet until the next visit (Tr. 440). In January, 2006, an esophagogastroduodenoscopy was performed for ongoing bleeding (Tr. 484). Plaintiff was noted to be "actively abusing alcohol" with "a history of one pint a day" (Tr. 473). The same month, x-rays showed that Plaintiff was developing

"severe degenerative changes" of the lumbar spine (Tr. 494). In March, 2006, Plaintiff reported level "nine" ankle pain on a scale of one to ten (Tr. 486). The following month, Plaintiff was treated for cellulitis and ulceration of both feet (Tr. 501).

## 2. Consultive and Non-Examining Sources

A September, 2002 Physical Residual Functional Capacity Assessment performed on behalf of the SSA found that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; walk or stand for six hours in an eight-hour workday; and sit to the extent she would be allowed to alternate positions (Tr. 180). The Assessment found that Plaintiff could push/pull in the upper extremities without limitation but experienced lower extremity impairments (Tr. 180). Plaintiff was limited to occasional ramp and stair climbing but precluded from work involving ladders, ropes, or scaffolds (Tr. 181). She was further limited to occasional balancing, stooping, kneeling, crouching, and crawling (Tr. 181). The Assessment found the absence of manipulative, visual, or communicative limitations but found that Plaintiff should avoid heights (Tr. 182-183). The Assessment concluded by stating that Plaintiff was only partially credible (Tr. 184). A July, 2002 Psychiatric Review Technique performed on behalf of the SSA found the absence of medically determinable psychological problems[3] (Tr. 154).

## C. Vocational Expert Testimony

---

[3]Treating records indicate that Plaintiff was receiving mental health counseling from July, 2002 forward (Tr. 269). As such, the July, 2002 Psychiatric Review Technique, performed without benefit of the mental health records discussed, would be of minimal value.

**1. June 18, 2004 Hearing**

VE Jennifer Turecki classified Plaintiff's previous work as a teacher as skilled and exertionally light; waitress, semi-skilled/light; direct care worker, semi-skilled/medium; telemarketer, semi-skilled/sedentary; billing clerk, semi-skilled/sedentary; prep cook, unskilled/medium; and laborer, unskilled/heavy[4] (Tr. 320). The ALJ posed the following question:

> "Please assume a hypothetical individual the same age, education and work experience as the Claimant.. Further assume that this . . . individual . . . has the additional exertional and non-exertional limitations as stated at Exhibit 11F [Residual Functional Capacity Assessment, Tr. 179-186] . This person is – was restricted to light work can carry 20 pounds frequently and 10 pounds occasionally. this person could stand or walk with normal breaks for a total of six hours in an eight hour workday. This person could sit for a total of six hours in an eight hour workday. This individual should avoid pushing and pulling motions with the lower extremities. This person should avoid unprotected heights, moving machinery and vibrations. And this person should not perform any activity involving ladders. Could such a person perform the jobs that we discussed as past work?"

(Tr. 321). The VE replied that the individual could perform Plaintiff's past relevant work as a waitress, telemarketer, and billing clerk (Tr. 321). The VE found that if the individual were further limited to "non-production-oriented work" with "simple one, two or three step instructions," all of Plaintiff's past relevant work would be precluded (Tr. 322). In response

---

[4] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

to additional hypothetical limitations of sedentary work and no work "that required vision other than close vision," the individual could not perform any of Plaintiff's past relevant work but could perform the unskilled work of a customer service representative (50,000 jobs in Southeastern Michigan), parking lot attendant (690), and receptionist (2,000) (Tr. 323).

The VE found that if Plaintiff's allegations that she "could only use close vision," needed "to elevate the ankle several times throughout the day," could only stand, walk, or sit for more than 30 minutes at a time, and experienced ongoing concentrational problems was fully credited, Plaintiff would be unable to perform any work (Tr. 323). The VE concluded by stating that her testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 324).

## 2. June 12, 2006 Hearing

VE Samuel Goldstein classified Plaintiff's former laundry work as semi-skilled at the medium exertional level; language teacher, skilled/light; waitress, semi-skilled/light; and telemarketer, semi-skilled/sedentary (Tr. 538). Plaintiff's attorney posed the following question:

> "I want you to assume an individual with a sedentary work capacity that is the same age, education, and work experience as the claimant. And I'd like you to further conclude that this individual is not able to engage in any prolonged standing or walking; not able to lift more than ten pounds; no use of ladders; being restricted to work with no far vision required; close visual tasks only and being restricted to non-production oriented work that is unskilled with simple one, two, or three-step instructions as well as that this individual; it is necessary for them to elevate [the right leg] at waist level or, or above for two or more hours out of an eight-hour day as needed for relief of pain and/or

swelling"

(Tr. 540-541). Dr. Goldstein testified that based upon the above limitations, the need to elevate the leg at or above waist level for two or more hours each day precluded all work (Tr. 542).

### D. The ALJ's Decisions

#### 1. July 13, 2004

Citing Plaintiff's medical records, ALJ Burgchardt determined that Plaintiff experienced the severe impairments of "status post fracture of the right ankle, reduced visual acuity, major depression, and [a] generalized anxiety disorder," finding however that none of the impairments met or medically equaled any of the impairments found in Appendix 1, Subpart P, Regulation no. 4 (Tr. 19).

The ALJ found that Plaintiff retained the following residual functional capacity ("RFC"):

> "not being able to engage in any prolonged standing or walking, not being able to lift more than ten pounds, no use of ladders, being restricted to work with no far vision required (close visual tasks only), and being restricted to non-production oriented work that is unskilled with simple, one, two, or three step instructions"

(Tr. 19).

Citing the VE's June 18, 2004 job findings, *supra,* the ALJ found that Plaintiff could perform customer service, parking lot attendant, and receptionist positions (Tr. 19). The ALJ supported her non-disability determination by stating Plaintiff "was not totally credible," citing Diane Olson's treating records for the proposition that Plaintiff's anxiety was

improving (Tr. 16).

## 2.  August 24, 2006

ALJ  Burgchardt found that Plaintiff experienced the severe impairments of "right bimalleolar fracture with open reduction and internal fixation on October 11, 2001 followed on November 2, 2001 with irrigation and debridement of her right lateral ankle wound and subsequent removal of plate and screws on January 12, 2002 . . . subsequent post-traumatic arthritis with arthroscopic chondroplasty and arthroscopic synovectomy of the right ankle, reduced visual acuity (20/60), mild recurrent major depression and generalized anxiety disorder with alcohol dependency and cocaine abuse" (Tr. 351).  She found however that none of the impairments met or medically equaled any of the impairments found in Appendix 1, Subpart P, Regulation no. 4 (Tr. 352).  The ALJ noted that while recent medical records showed hepatitis C with mild cirrhosis of the liver, the conditions post-dated Plaintiff's December 31, 2003 expiration of insurance benefits (Tr. 351).

The ALJ found that Plaintiff retained the following residual functional capacity ("RFC"):

> "to stand/walk two of eight hours, sit six of eight hours, lift ten pounds occasionally and lesser weights frequently and limited to unskilled work with simple one, two or three step instructions that is not production oriented"

 (Tr. 352).

Consistent with her earlier findings, the ALJ determined that Plaintiff was unable to perform any of her past relevant work (Tr. 359).  Again citing VE Tureki's June 18, 2004 job findings, the ALJ found that Plaintiff could perform customer service, parking lot attendant,

and receptionist positions (Tr. 360). The ALJ discounted Plaintiff's allegations of disability, noting that Plaintiff's original hearing testimony "greatly minimized" her drinking (Tr. 357). The ALJ noted that Plaintiff's treating records referenced ongoing work activity (Tr. 357). The ALJ observed that Plaintiff testimony that she continued to bike stood at odds with allegations of ankle problems (Tr. 357).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services,* 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services,* 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes several arguments in favor of remand. First, she contends the ALJ failed to explain her reasons rejecting the opinions of Drs. Sprague, Baghdoian, and Madhavan. *Plaintiff's Brief* at 15-9, *Docket #14.* Second, she argues that the ALJ erred in discounting her own allegations of disability. *Id.* at 19-21. Third, Plaintiff contends that the ALJ did not meet the Step Five burden of showing that she could perform a substantial number of jobs in the national economy. *Id.* at 21-22 (*citing* SSR 00-4p). Finally, she argues

that the regional job numbers cited by the VE (reflecting the seven-county area of southeastern Michigan) do not account for her inability to access public transportation outside of Wayne, Oakland, and Macomb Counties. *Id.* at 22-26.

### A. The Treating Physicians' Analyses

### 1. General Principles

"If uncontradicted, the [treating] physicians' opinions are entitled to complete deference." *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (FN 7)(6th Cir. 1991). "[I]f the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue, 573* F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004)).  Further,

> "[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion."

*Wilson,* at 544.

Regardless of whether substantial evidence is found elsewhere in the record to contradict the source's findings, the ALJ is required nonetheless to give "good reasons" for rejecting the treating physician's opinion:

"'The requirement of reason-giving exists, in part, to let claimants understand

-17-

the disposition of their cases,' particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"

*Wilson* at 544 (*citing Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)). The mere fact that a treating physician's opinion is contradicted by another source is not a sufficient basis for its rejection. *Hensley* at 266 ("Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion."). However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings. *Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391 -392 (6th Cir. 2004).

## 2. Application to the Present Case

### a) Drs. Sprague and Baghdoian

While the ALJ stated that she gave "great weight" to the opinions of these two physicians, she rejected their findings that Plaintiff needed to keep her leg elevated at waist level for two hours of each work shift (Tr. 359). The ALJ faulted Dr. Sprague for stating that Plaintiff had experienced ankle problems since August, 2001 while in fact, the fracture did not occur until October, 2001 (Tr. 356-357). The ALJ further noted that Dr. Sprague did not see Plaintiff after January, 2003 when some hardware was removed (Tr. 358). She states that "Dr. Sprague's notes reflect a program of physical therapy and home exercises and antibiotic

use because of infection but do not reflect elevation of the right leg above waist level" (Tr. 358).

Contrary to the ALJ's findings, the record indicates significant ongoing limitations as a result of the October, 2001 ankle fracture. First, a layperson could discern that the October, 2001 surgery was followed by unforeseen complications. Plaintiff's recovery was first hampered by a post-surgical infection - serious enough to require a followup procedure the following month (Tr. 150). Although the ALJ relies on the fact that Dr. Sprague prescribed physical therapy in December, 2001, this is not inconsistent with his later statement that Plaintiff needed to elevate her right leg periodically (Tr. 136). The following month, Dr. Sprague's treating notes indicate that Plaintiff's infection had not subsided and as a result he was required to (prematurely) remove hardware implanted during the October, 2001 surgery (Tr. 134, 153). As a result of the fracture and ensuing complications, by May, 2002, Plaintiff had developed osteoarthritis of the ankle (Tr. 131). The same month, she was diagnosed with tibial tendon abnormalities requiring the use of a custom medical device (Tr. 130). Although the ALJ characterizes Plaintiff's ankle problems as having resolved after this point, counseling notes created in March, 2003 indicate that on occasion, Plaintiff was unable to walk as a result of ankle pain (Tr. 235).

Second, the ALJ did not provide adequate reasons for rejecting Dr. Baghdoian's opinion. Most obviously, she erroneously found that Plaintiff did not seek ankle treatment between March 2003 and March, 2006, contrary to record evidence showing that Plaintiff

sought treatment on *numerous* occasions during this period (Tr. 359). In July, 2003, Dr. Baghdoian found that she had limitations in dorsi and plantar flexion (Tr. 406). An August, 2003 MRI confirmed the presence of arthritis (Tr. 404). The following month, Plaintiff presented with a "puffy, swollen, and tender right ankle" (Tr. 402).

In November, 2003, arthroscopic surgery revealed that Plaintiff had experienced significant cartilage loss (Tr. 397). Dr. Baghdoian's February, 2004 treating notes show that he recommended steroid injections (Tr. 394). Although the ALJ makes much of Dr. Baghdoian's March, 2004 comment that Plaintiff was working full-time, in fact his later statement that Plaintiff was "in the cleaning business, on a *part-time* basis" is consistent with mental health treating records from the same period which indicate that Plaintiff was "performing odd jobs" (Tr. 200). The ALJ also emphasizes Dr. Baghdoian's finding that Plaintiff could return to work in mid-June. However, May, 2004 treating notes show that the physician was referring to part-time work only (Tr. 389). Thus, his "return to work" opinion is not inconsistent with his statement that Plaintiff needed to keep her right leg elevated several times a day. March, 2006 treating notes showing ankle and foot swelling also indicate that Plaintiff experienced and was treating for *ongoing* ankle problems from October, 2001 forward.

### b) Dr. Madhavan

The ALJ discredited Dr. Madhavan by stating that his "examples of decompensation are not what the Social Security Act considers decompensation" (Tr. 358). She also

discounted the treating psychiatrist's opinion by reasoning that "[i]t is difficult to see what evidence the psychiatrist had that the claimant could not function outside of a highly supportive living situation since her situation of living with an unfaithful, verbally abusive, drug using husband was very stressful" (Tr. 358).

The ALJ ignores the thrust of Dr. Madhavan's assessment.  She discredits the psychiatrist's "decompensation" findings, instead characterizing the three episodes in question as "responses to difficult situations" (Tr. 358); *supra* at 9.   However, Dr. Madhavan's assessment, also stating that Plaintiff's ability to act "in an emotionally stable manner" was poor to non-existent, obviously implies that Plaintiff's *reaction* to stressful events (rather than the event itself) was well outside the bell curve (Tr. 282).  Moreover, Dr. Madhavan's assessment is well-supported by Olson's counseling notes and her September, 2004 letter indicating that Plaintiff experienced "a sustained anxiety disturbance that has not responded well to therapy and treatment on a sustained basis" (Tr. 286).   Consistent with both Olson and Madhavan's opinions,  a treating dermatologist noted that Plaintiff exhibited behavior during a July, 2004 medical examination "consistent with a diagnosis of an anxiety disorder (Tr. 439).

Thus, the ALJ's rejection of the treating physicians' opinions is neither well-explained nor supported by the record.

### B.  The Credibility Determination

Next, Plaintiff takes issue with the ALJ's credibility determination.  *Plaintiff's Brief*

at 19. Plaintiff, acknowledging that she misrepresented her alcohol abuse at the first hearing, points out that her statements concerning substance abuse were immaterial to her testimony regarding limitations as a result of ankle, eye, and emotional problems. *Id.* at 20 (*citing* Tr. 357, 535). Contrary to the ALJ's finding that she did not report post-August, 2001 work activity, Plaintiff notes that in fact, she disclosed part-time work as a Spanish teacher and housekeeper. *Id.* at 20 (*citing* 295-296).

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms. *See Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 853 (6th Cir. 1986). "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* Second, SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must analyze his testimony "based on a consideration of the entire case record." C.F.R. §404.1529(c)(3) lists the factors to be considered in making a credibility determination, including daily activities, "precipitating and aggravating factors," treatment received for relief of symptoms, and additional considerations relevant to functional limitations. 20 C.F.R. § 404.1529(c)(3). The ALJ credibility determination is accorded great deference. *See Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993); *See also Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir. 1989)(*citing Imani v.*

*Heckler,* 797 F.2d 508, 512 (7th Cir.1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

The ALJ discounted Plaintiff's credibility by noting that at the first hearing, she lied about her drinking (Tr. 357). The ALJ also found that Plaintiff's testimony at the first hearing regarding work activity was "less than accurate" (Tr. 357). The ALJ noted that although Plaintiff claimed eye problems that she admitting to reading three hours a day (Tr. 357). She observed that despite alleged ankle problems, Plaintiff continued to bike (Tr. 357). She cited Plaintiff's testimony that she would be able to teach if she did not have a felony conviction (Tr. 357).

First, I agree that the ALJ was entitled to discount Plaintiff's claims on the basis that she lied about drinking relapses. The ALJ permissibly noted that her June 18, 2004 testimony that she no longer drank contradicted treating records showing several relapses (Tr. 357). Plaintiff own testimony that she believed that she could return to teaching if she did not have a felony conviction (which I interpret as an "aspirational" rather than a realistic assessment of her own abilities) could also arguably be used to discredit her claim that she was disabled.

The ALJ's other reasons for rejecting Plaintiff's credibility are closer calls. While the ALJ attempted to discredit vision impairment claims by noting that Plaintiff read three hours every day, the ALJ elsewhere acknowledges well-documented vision problems precluding driving and any activity requiring *distance* vision (Tr. 357). Although the ALJ

cited Plaintiff's testimony that she biked up to half a mile at a time (Tr. 357), Plaintiff actually testified that she biked only when her foot was feeling "good" (Tr. 316). In any case, assuming that Plaintiff was biking at the slow pace of 10 miles per hour, a half mile ride would take approximately three minutes. Plaintiff's three-minute bike rides are not inconsistent with her allegations of disability. *See Walston v. Gardner,* 381 F2d 580, 585-586 (6th Cir. 1987)(activities performed on an intermittent basis, standing alone, do not establish the ability to perform such tasks on a sustained basis). Contrary to the ALJ's finding that Plaintiff was not truthful about her work activity after filing the disability claim, Plaintiff admitted to sporadic work as a Spanish tutor and house cleaner at the June 18, 2004 hearing (Tr. 265).

Therefore, the ALJ's credibility determination was to a large extent flawed.

### C. Vocational Expert Testimony

Plaintiff's third and fourth arguments both pertain to the VE's testimony. She contends that the VE's June 18, 2004 job findings do not comport with the information found in the DOT. *Plaintiff's Brief* at 21-22 (*citing* SSR 00-4p). Further, Plaintiff submits that the VE's job numbers for the Southeastern Michigan region do not account for her reliance on public transportation, noting that a significant number of these jobs would be accessible only by car. *Plaintiff's Brief* at 22-26.

Consideration of whether the VE's findings comported with the procedural requirements of a Step Five determination is mooted by more substantive errors in the

-24-

testimony.  As discussed in Section **A.**, *supra*, the record contains an uncontradicted (and thus controlling) treating opinion that Plaintiff needed to elevate her ankle to waist level for a substantial portion of each shift, along with marked work-related psychological limitations. The omission of these impairments from the hypothetical question taints the VE's finding that Plaintiff could work as a customer service representative, parking lot attendant or receptionist (Tr. 323).  *See Varley, v. HHS,* 820 F.2d 777, 779 (6th Cir. 1987)("Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays [the] plaintiff's individual physical and mental impairments")(internal citations omitted).  In and of itself, the ALJ's failure to account for Plaintiff's true degree of limitation as a result of right ankle problems invalidates the job findings. Further, both vocational experts testified that Plaintiff's need to elevate her right leg to at least waist level for two hours a day, along with her other limitations, would preclude all work (Tr. 323, 542).

The 2006 administrative opinion is marked by an additional error.  The February 22, 2006 Appeals Council remand directs the ALJ to "receive evidence from a Vocational Expert" consistent with the requirements of SSR 00-04 (Tr. 372).   However at the second hearing, while  Plaintiff's attorney was permitted to question the VE, the ALJ did not pose a hypothetical question to the VE or otherwise obtain job findings (Tr. 540-541).   Further and more disturbingly, while the 2004  RFC includes limitations as a result of Plaintiff's eye condition, the RFC contained in the latter opinion makes no mention of work-related visual

limitations (Tr. 352).

### D. Remand

Because the ALJ's decision is not supported by substantial evidence, a remand is required. The final question is whether to remand for further administrative proceedings and findings or to remand for an award of benefits using Plaintiff's disability onset date for calculating past due benefits. *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), hold that it is appropriate to remand for an award of benefits when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Id.* This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking. *Faucher,* 17 F.3d at 176 (citing *Mowery v. Heckler*, 771 F.2d rectification, 973 (6th Cir. 1985)).

A discussed above, the great weight of evidence, including unanimous treating source opinion, supports Plaintiff's claim of disability. *Faucher, supra.* While the ALJ scoured the record for a basis to reject both treating opinion and Plaintiff's own assessment of her condition, these reasons (such as the fact that one treating physician stated that Plaintiff broke her ankle in August rather than October, 2001) are peripheral to overwhelming record support for a finding of disability. *See Laskowski v. Apfel,* 100 F.Supp.2d 474, 482 (E.D.Mich.2000)(Lawson, J.)("Substantial evidence cannot be based on fragments of the

record.").

The ALJ's opines in regard to Plaintiff that "[a]lcohol is her problem and she has had several slips" (Tr. 357). To be sure, the record contains undisputed evidence that Plaintiff has relapsed since beginning therapy. Pursuant to 42 U.S.C. § 423(d) (2)(c), benefits cannot be awarded on the basis of alcoholism or drug addiction. "In order to determine whether alcoholism or drug addiction constitutes a 'contributing factor material' to the finding of disability, the ALJ must determine whether the claimant would be disabled 'if [she] stopped using drugs or alcohol.'" *Edwards v. Commissioner of Social Sec.,* 654 F.Supp.2d 692, 708 -709 (W.D.Mich. 2009)(*citing* 20 C.F.R. § 404.1535(b)(1)).

The record shows disability-level limitations independent of Plaintiff's alcohol use. Plaintiff's well-documented vision and ankle problems are unrelated to her sometimes unsuccessful attempts to abstain from alcohol. Most compellingly, two separate vocational experts found that Plaintiff's need to elevate her leg for a portion of each workday, along with vision and concentration problems, would preclude all work. This limitation was attested to by two treating physicians whose opinions are uncontradicted by the record.

As to Plaintiff's psychological issues, a close reading of Diane Olson's counseling notes indicates that the freestanding conditions of depression and anxiety (while sometimes exacerbated by relapses) were only partially attributable to alcohol abuse. The record shows that Plaintiff continued to experience anxiety even during periods of sobriety (Tr. 205). Because the transcript strongly supports Plaintiff's disability claim of ankle, eye, and

emotional conditions *independent* of alcohol abuse, a remand for benefits is appropriate.

Finally, although benefits would ordinarily be calculated from the alleged onset date (August 10, 2001) I note that Plaintiff did not sustain the ankle fracture until October 7, 2001. Accordingly, benefits should calculated from that date rather than August 10, 2001.


## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED, remanding this case for an award of benefits, to be calculated from October 7, 2001.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections,

the opposing party may file a response. The response shall be not more than twenty (20)

pages in length unless by motion and order such page limit is extended by the court. The

response shall address specifically, and in the same order raised, each issue contained within

the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: March 31, 2010

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys
and/or parties of record by electronic means or U.S. Mail on March 31, 2010.

s/Susan Jefferson
Case Manager